# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 08 2019, 10:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

F.S. and A.S. (Minor Children)

and

A.N. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

July 8, 2019

Court of Appeals Case No. 19A-JT-210

Appeal from the Tippecanoe Superior Court

The Honorable Faith Graham, Judge

Trial Court Cause Nos. 79D03-1805-JT-77, 79D03-1805-JT-78

**Altice, Judge.**

## Case Summary

[1] A.N. (Mother) appeals from the involuntary termination of her parental rights to two of her minor children, F.S. and A.S. (collectively, the Children).[1] She challenges the sufficiency of the evidence supporting the termination order.

[2] We affirm.

## Facts & Procedural History[2]

[3] On November 21, 2016, the day after A.S.'s birth, the Department of Child Services (DCS) became involved with the family because A.S.'s cord blood tested positive for cocaine. The following day, a hair follicle test was performed on F.S., who was eighteen months old. The test later returned positive for methamphetamine. Mother admitted to cocaine use during the pregnancy, as well as spice and marijuana, and acknowledged that she needed help with

---

[1] Mother has another child who lives with an established guardian.

[2] The Children's father's rights were also terminated, but Father has not appealed the termination order. Accordingly, our recitation of the facts will focus on those related to Mother.

addressing her substance abuse.  At the time, DCS permitted the Children to remain in the home with services.

[4]    DCS filed a petition alleging that that the Children were children in need of services (CHINS) on December 6, 2016.  At the factfinding hearing on January 31, 2017, Mother and Father both admitted that the Children were CHINS.  Following the dispositional hearing on February 21, 2017, the trial court determined that the Children should remain in Mother's care and ordered Mother to participate in services.  Specifically, she was ordered to remain drug and alcohol free, submit to random urine screens, participate in individual therapy, and complete assessments for substance abuse, domestic violence, and parenting and follow all recommendations following the assessments.

[5]    Almost immediately thereafter, the trial court held a modification hearing and issued an order, on March 2, 2017, modifying the dispositional decree.  The court ordered the removal of the Children from Mother's home and placement in foster care based on the following findings:

> Mother and Father have been involved in two (2) domestic violence altercations and the children have been present.  Father has been warned about trespassing and continues to go to the home.  Mother allowed Bryce Henderson to stay in her home and he was arrested for an outstanding warrant.  Mother reported she had only known Mr. Henderson for approximately one (1) month and allowed him to stay as he did not have utilities and she felt bad for him.
>
> Both of these children have been exposed to substances.  Mother admitted to using cocaine during her pregnancy … [and F.S.]

tested positive for methamphetamine …. It is a concern Mother allowed someone she has only known for a month to reside in the home she shares with her children.

*Exhibits Vol. 1* at 26. The Children have remained in foster care since their removal.

[6] In early May 2017, Mother became incarcerated, first in the Tippecanoe County Jail and then the Indiana Department of Correction, for battery with a deadly weapon. She was placed on work release on or about January 4, 2018. Following her release from prison, Mother began participating in services referred through DCS. She completed an intake assessment with a therapist at Wabash Valley Alliance on January 16, 2018, and a substance use assessment later that month. The therapist recommended individual counseling, which was scheduled but Mother never attended. Mother began supervised visits with the Children at the beginning of February 2018 and had a handful of visits before she was reincarcerated from mid-February through mid-April 2018, following her use of illegal drugs. Thereafter, she was returned to work release where she was serving a term of probation.

[7] At a permanency hearing on May 17, 2018, the trial court authorized DCS to file petitions to terminate the parent-child relationship. Despite the move toward termination, the court ordered DCS to continue to fund services for Mother, including substance abuse evaluation and treatment, individual counseling, case management, and supervised visits. The court noted that Mother "needs to be actively complying with all services, submitting to random

drug screens and staying clean from any and all substances." *Id*. at 68. DCS filed the instant termination petitions on May 24, 2018.

[8] DCS re-referred services for Mother after her release from incarceration in April 2018. Mother visited with the Children three times in April and then did not show for a visit on April 26 due to being incarcerated. She then visited with the Children on May 22. This was her last contact with the Children, as visitation services were suspended due to Mother's failure to comply with random drug screens. Mother had been a no-show for drug screens during the entire month of May. She submitted to one screen in June and then none thereafter. Mother stopped contacting the family case manager (FCM), Jessica Wingate, entirely after June 14, 2018. Additionally, although referred by DCS, Mother never completed a parenting assessment, a domestic violence assessment, or individual counseling.

[9] The termination factfinding hearing took place on August 16, 2018 and October 10, 2018. FCM Wingate testified that Mother had a period of partial compliance starting in January 2018, which ended when Mother was reincarcerated the following month. Despite being given the opportunity to engage in services upon her release, Mother did not successfully complete any services and was generally non-compliant. Further, FCM Wingate testified that the Children do not know Mother, which caused FCM Wingate concern for their emotional well-being during visits with Mother. Once the visits ceased, FCM Wingate explained that the Children "finally ha[d] some emotional well-being and consistency." *Transcript Vol. 2* at 99. In sum, FCM Wingate

recommended termination as in the best interests of the Children because "Mother has not been compliant when it was available for her to engage and she does not have a relationship with the children at this time." *Id*. at 100.

[10]    Similarly, the CASA, Erika O'Brien, recommended termination. CASA O'Brien had been assigned to the Children since May 2017. She explained her recommendation as follows:

> This has been a long road, best described as a roller coaster. I've had a lot of faith in the proceedings and Dad has been on the right track, he was doing a great job and then just fell off. Mom, once she got out of jail she was on track, she was doing a great job. She then got off track, was incarcerated, we had to restart. So, all those things and at this point in the last few months Dad has not been involved, neither has Mom. I've seen … no change or improvement or move towards getting the children at this juncture.

*Id*. at 118. CASA noted that since her involvement in the case – nearly a year and a half at the time – Mother had engaged in services for about a total of sixty days. Indeed, Mother acknowledged during her own testimony that her period of success with services lasted only "about 60 days." *Id*. at 135. Mother testified that this success ended in February 2018 after she "admitted to smoking spice" while in community corrections. *Id*. at 134.

[11]    On December 17, 2018, the trial court issued its order terminating the parent-child relationship between Mother and the Children. Mother now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[12]    When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[13]    We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

On appeal, Mother asserts that DCS failed to present clear and convincing evidence that the conditions resulting in the Children's removal would not be remedied, that the continuation of the parent-child relationship poses a threat to the Children's well-being, and that termination is in the best interests of the Children. We will address each of these in turn, as needed.

[16] Mother first contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied. In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.* The court may consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[17] The record establishes that the reasons for the Children's removal and continued placement outside Mother's home centered on concerns of substance abuse and domestic violence.[3] On a related note, Mother's unstable lifestyle

---

[3] Mother asserts that "DCS failed to elicit any testimony proving the reasons for removal". *Appellant's Brief* at 11. The reasons for removal, however, are amply established in the exhibits that were admitted at trial without objection from Mother.

and anger issues led to repeated incarcerations. By the conclusion of the termination hearing, the Children had been removed from Mother's care for twenty months and she had spent ten of those months incarcerated at various times. For the ten months that she was not incarcerated, she participated in some services, by her own account, for only about two months.

[18] The trial court's detailed findings of fact set out Mother's history of compliance throughout the case, as well as her incarcerations. The court then summarized:

> 15. During the CHINS case, Mother demonstrated compliance with services for approximately six (6) to (8) weeks. Otherwise Mother failed to attend services even when not incarcerated. Mother failed to successfully complete any services. Mother was last discharged from services on May 30, 2018 for lack of contact and compliance.
>
> 16. Mother failed to complete a parenting assessment. Since February 2018, Mother has attended only approximately ten (10) scheduled visits. In April/May 2018, Mother was scheduled to participate in supervised parenting time twice per week. However, Mother attended only three (3) scheduled visits on April 18, April 20, and April 23, 2018. Mother was incarcerated at the time of the next visit scheduled on April 26, 2018. Mother attended a scheduled visit on May 22, 2018. Mother's visits were thereafter suspended for failure to engage in random drug screening. Mother's last contact with the children was on May 22, 2018.

*Appendix Vol. II* at 23.

[19] The evidence and the court's findings of fact overwhelming establish a reasonable probability that the conditions resulting in the Children's removal

and continued placement outside Mother's home will not be remedied. There were no changed conditions at the time of the termination hearing, and Mother had made no progress in the five months following her most-recent release from incarceration in May 2018. Particularly telling of Mother's lack of commitment to do what needed to be done to reunify with the Children was her decision to end visits with them rather than submit to drug screens and to cease contact with FCM Wingate.

[20] I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, having upheld the trial court's conclusion under I.C. § 31-35-2-4(b)(2)(B)(i), we need not review the trial court's determination that continuation of the parent-child relationship would pose a threat to the Children's well-being.

[21] Finally, Mother asserts that the evidence was insufficient to support the trial court's determination that termination was in the Children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-

appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[22] Mother's brief argument regarding the best-interest element is that she loves the Children and that, due to her incarcerations, she has not been given the opportunity to prove that she can care for them. She also asserts that she and the Children are bonded and, thus, it would not be in the Children's best interests to have their relationship with her severed.

[23] On the contrary, the evidence establishes, and the trial court found, that the Children have no bond with Mother. Between May 2017 and October 2018, the Children had only visited with Mother about ten times. The lack of visits was due to Mother's multiple incarcerations and her refusal to submit to random drug screens. As we have recognized, "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (quoting *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)), *trans. denied*.

[24] Both the CASA and the FCM recommended termination of Mother's parental rights. Moreover, as the trial court found:

> CASA noted that neither parent has been involved or made any steps toward reunification in the past few months. CASA reported the children are confused and emotionally troubled by

inconsistent contact with the parents. The children were emotionally impacted by Mother's absence and Father's inconsistent presence. The children did not demonstrate a bond with Mother at all. Since parenting time ceased, the children have emotionally stabilized. The children are currently placed with foster parents who are willing to adopt the children. The children are adoptable even if the current foster family is unable to adopt for any reason.

*Appendix Vol. II* at 24. The evidence was sufficient to show by clear and convincing evidence that termination was in the Children's best interests.

Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.